UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH WILLIS, ) | No. EDCV 07-1398-RC |
| ) | |
| Plaintiff, ) | |
| ) | OPINION AND ORDER |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff Elizabeth Willis filed a complaint on November 6, 2007, seeking review of the Commissioner's decision denying her application for disability benefits. The Commissioner answered the complaint on March 21, 2008, and the parties filed a joint stipulation on May 8, 2008.

**BACKGROUND**

**I**

On July 12, 2005, plaintiff applied for disability benefits under the Supplemental Security Income program ("SSI") of Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1382(a).  Certified

Administrative Record ("A.R.") 12. The plaintiff's application was initially denied,[1] and was denied again on March 22, 2006, following reconsideration. A.R. 37-48. The plaintiff then requested an administrative hearing, which was held before Administrative Law Judge Jay E. Levine ("the ALJ") on July 10, 2007. A.R. 27, 402-24. On July 24, 2007, the ALJ issued a decision finding plaintiff is not disabled. A.R. 9-20. The plaintiff appealed this decision to the Appeals Council, which denied review on August 31, 2007. A.R. 4-7.

## II

The plaintiff, who was born on March 15, 1953, is currently 55 years old. A.R. 72, 78. She has an eleventh-grade education and previously worked as a childcare provider. A.R. 103-10, 406-07. The plaintiff has both physical and mental complaints.

**A.   Physical Complaints:**

On September 30, 2003, Jagvinder Singh, M.D., an internist, examined plaintiff and diagnosed her with low back pain, atypical chest pain, and a history of neck pain, migraine headaches, and arthritis. A.R. 134-38. Dr. Singh found plaintiff had multiple subjective complaints and decreased range of motion of the dorsolumbar spine, which he attributed to plaintiff's poor effort. A.R. 138. Similarly, Dr. Singh determined that plaintiff "did very bad on Jamar handgrip strength but when I asked [her] to hold my hand and lean backward, . . . her handgrip strength [was] within normal limits."

---

[1] Plaintiff previously applied for SSI benefits on four different occasions, A.R. 72-74, 78-80, 404; however, those applications were also denied. A.R. 49-62.

Id.  Dr. Singh concluded:

> [plaintiff] is able to stand and walk for 6 hours.  Sitting is no restriction.  She does not require the use of assistive devices.  She would be able to lift and carry occasionally and frequently . . . 50 & 25 pounds.  Posturally and manipulatively, there are no restrictions.  Environmentally, the [plaintiff] should avoid work at extremes of temperature and at heights.

Id.

On April 26, 2004, Concepcion A. Enriquez, M.D., an internist, examined plaintiff and concluded she has no impairment-related physical limitations.  A.R. 167-71.

Between May 21, 2003, and June 4, 2007, plaintiff received treatment from Craig Mueller, M.D., and others at Family Practice Associates, where she was diagnosed with lumbar disc disease, peripheral neuropathy,[2] arteriosclerosis, left knee osteoarthritis, degenerative joint disease and anemia, among other conditions.  A.R. 248-62, 284-338, 366-401.  Cervical spine x-rays taken on September 17, 2004, demonstrated degenerative arthritic changes with disc space narrowing at C5-C6, and lumbar spine x-rays obtained the

---

[2] Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown."  Dorland's Illustrated Medical Dictionary, 1212 (20th ed. 2000).

3

same day show degenerative arthritic changes with disc space narrowing at L4-L5 and L5-S1.  A.R. 259, 332.  X-rays of both knees taken on July 9, 2004, were normal.  A.R. 258, 333.

On February 11, 2005, Rajan H. Karnani, M.D., examined plaintiff and diagnosed her with fibromyalgia, probable arthritis, rule out cervical or lumbosacral radiculopathy,[3] and other conditions.  A.R. 256.  A lumbar spine MRI obtained on March 22, 2005, demonstrated bulging discs at L4-L5 and L5-S1, degenerative arthritic changes of the lumbar spine with disc degeneration at L4-L5 and L5-S1, and no free disc fragments, canal stenosis, lateral recess narrowing, or foramen encroachment.  A.R. 250.  Electromyography ("EMG") of the lower limbs performed on July 6, 2005, revealed evidence of sensory-neural peripheral neuropathy in the lower extremities and as L5-S1 radiculopathy.  A.R. 251-52.  X-rays of both knees taken on April 26, 2006, demonstrated a small amount of right knee effusion, but no other abnormalities.  A.R. 381.

On September 17, 2005, nonexamining physician F. Kaimar, M.D., opined plaintiff can occasionally lift and/or carry 20 pounds, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, frequently lift and/or carry 10 pounds, should avoid concentrated exposure to extreme cold, hazards, and machinery, and cannot climb ladders, ropes, and scaffolds.  A.R. 218-25.  On March 21, 2006, nonexamining physician Gwendolyn Taylor-Holmes reaffirmed Dr. Kaimar's opinion.

---

[3] Radiculopathy is "disease of the nerve roots."  Dorland's Illustrated Medical Dictionary at 1511.

4

A.R. 246.

On September 26, 2006, Dr. Mueller opined[4] plaintiff: can frequently lift and/or carry less than 10 pounds; can stand and walk for less than 2 hours in an 8-hour day; can stand for 5 minutes before changing positions, and must walk for 5 minutes every 10 minutes; can sit for less than 2 hours in an 8-hour day, and 15 minutes at a time before changing positions; must be able to switch positions at will; can never twist, stoop, crouch or climb stairs or ladders; must lie down at unpredictable intervals throughout the day; must avoid all exposure to extreme cold and hazards, must avoid even moderate exposure to wetness and humidity, and must avoid concentrated exposure to extreme heat; is limited in her ability to feel with her fingers; and would miss more than three days of work a month due to her condition.  A.R. 362-64.

**B.   Mental Complaints:**

On September 18, 2003, Trevinder Ahluwalia, M.D., examined

---

[4] Dr. Mueller's opinions were expressed in a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)"; however, the signature on the form is illegible. A.R. 362-64.  As discussed below, one of the main issues here is whether the ALJ properly rejected the opinion of the physician who completed this form.  See Jt. Stip. at 3:16-8:20.  Although plaintiff's attorney submitted this form to the ALJ, A.R. 361, he has not explained who completed the form other than identifying the author as a "treating physician."  See Jt. Stip. at 3:16-5:21, 8:16-20.  Nevertheless, since the Commissioner suggests the physician's signature resembles Dr. Mueller's, Jt. Stip. at 6 n.3, and Dr. Mueller is one of plaintiff's treating physicians, the Court will, for purposes of this opinion, find Dr. Mueller completed the form.

plaintiff and diagnosed her as having an unspecified depressive disorder and an unspecified personality disorder, and determined plaintiff's Global Assessment of Functioning ("GAF") was around 60.[5] A.R. 130-33. Dr. Ahluwalia opined plaintiff "is a poorly motivated and poor historian, who presents with vague symptoms of depression and numerous somatic complaints." A.R. 133. He further opined plaintiff "appears limited in her ability to interact with fellow employees and supervisors due to her poor motivation, her dysphoric mood and her numerous physical preoccupations. She appears able to follow simple instructions." Id.

On October 1, 2003, nonexamining psychiatrist Michael Skopec, M.D., determined plaintiff has unspecified depression and an unspecified personality disorder. A.R. 139-52. Dr. Skopec opined plaintiff has "mild" restriction in her activities of daily living, "moderate" difficulty maintaining social functioning, "mild" difficulties maintaining concentration, persistence or pace, and there is "insufficient evidence" of any episodes of decompensation. A.R. 149. Dr. Skopec further opined plaintiff is "moderately" limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within

---

[5] A GAF of 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

6

customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and interact appropriately with the general public; but otherwise, she is not significantly limited or there is no evidence of limitation. A.R. 153-56. Dr. Skopec concluded, regardless of motivation, plaintiff can sustain simple repetitive tasks with adequate pace and persistence and can adapt and relate to coworkers and supervisors; but she cannot work with the public. A.R. 155.

On January 3, 2005, Rosa Colonna, Ph.D., a licensed clinical psychologist, examined plaintiff, conducted psychological testing, and diagnosed plaintiff as malingering, rule out mood disorder due to generalized medical condition and chronic pain, and a personality disorder with borderline avoidance traits, and determined plaintiff's GAF was 65.[6] A.R. 197-203. Dr. Colonna found the psychological test results were invalid due to poor effort on plaintiff's part, and specifically noted that a memory-malingering test showed plaintiff was malingering. A.R. 200-02. Dr. Colonna concluded plaintiff can understand, remember, and carry out short and simplistic instructions without difficulty and make simple work-related decisions without special supervision, but "[s]he presents with a mild inability to

---

[6] A GAF of 65 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

7

understand, remember, and carry out detailed instructions" and a mild inability to interact appropriately with supervisors, coworkers, and peers.  A.R. 202.  Dr. Colonna concluded plaintiff "appeared to be malingering at the time of the examination but may have an authentic underlying mood disturbance. . . .  She appears to be on an excessive amount of medications."  A.R. 203.

On September 23, 2005, B. Schweitzer, MFT, examined plaintiff at the San Bernardino County Department of Mental Health ("Dept. Mental Health"), and diagnosed her with dementia due to medical conditions, an unspecified psychotic disorder (rule out substance induced disorder), suspected alcohol dependence (rule out malingering), and an unspecified personality disorder, and determined plaintiff's GAF was 50.[7]  A.R. 341-45.

On November 8, 2005, Jeremiah Umakanthan, M.D., examined plaintiff and diagnosed her with an unspecified psychotic disorder and an unspecified depressive disorder.  A.R. 349-52.  Dr. Umakanthan found plaintiff was possibly malingering, A.R. 352, but continued to treat her, prescribing medication.  A.R. 347, 353-58.

On November 1, 2005, John L. Woodard, M.D., a psychiatrist,

---

[7] A GAF of 50 means that the plaintiff exhibits "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

examined plaintiff and diagnosed her with a dependent personality disorder with fair adaptive functioning.[8] A.R. 226-29. Although the plaintiff complained of paranoia and auditory hallucinations, Dr. Woodard found "[t]he history of psychiatric symptomatology is lacking in credibility." A.R. 228. Dr. Woodard also found plaintiff made no effort to respond to questioning and her responses were often manipulative. Id. Dr. Woodard concluded:

> Work impairments in this case on the basis of psychiatric considerations appear to be the result[] of certain personality immaturities with adverse motivations and passive dependent features. Because of limited cooperation and manipulative responses to questions, the estimation of her incapacities is less than definitive. [¶] Impairments appear to be slight for interacting with supervisors, coworkers and the public, for maintaining concentration and attention, for withstanding normal stresses and pressures in the workplace, and for performing detailed, complex tasks; and none for performing simple, repetitive tasks. Incapacity is none for working on a continuous basis without special supervision and slight for completing a normal workweek without interruption.

Id.

//

---

[8] Dr. Woodard was unable to provide an Axis I diagnosis because plaintiff was uncooperative. A.R. 228.

On November 21, 2005, nonexamining psychiatrist Donald Williams, M.D., opined, as he had on January 18, 2005, that plaintiff does not have a severe mental impairment in that she has only "mild" difficulty maintaining social functioning and concentration, persistence or pace, she does not have any restriction in her activities of daily living, and she has had no episodes of decompensation.  A.R. 204-17, 230-43.  On March 21, 2006, nonexamining psychiatrist K. Gregg, M.D., reaffirmed Dr. Williams's opinions.  A.R. 230.

## DISCUSSION

### III

The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision denying plaintiff disability benefits to determine if his findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching his decision.  Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1172 (9th Cir. 2008); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008).

"In determining whether the Commissioner's findings are supported by substantial evidence, [this Court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001).  "Where the evidence can reasonably support either affirming or reversing the decision, [this Court] may not substitute [its] judgment for that of the Commissioner."  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007),

10

1 cert. denied, 128 S. Ct. 1068 (2008); Lingenfelter v. Astrue, 504 F.3d
2 1028, 1035 (9th Cir. 2007).

4     The claimant is "disabled" for the purpose of receiving benefits
5 under the Act if she is unable to engage in any substantial gainful
6 activity due to an impairment which has lasted, or is expected to
7 last, for a continuous period of at least twelve months.  42 U.S.C. §
8 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  "The claimant bears the
9 burden of establishing a prima facie case of disability."  Roberts v.
10 Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122
11 (1996); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).

13     The Commissioner has promulgated regulations establishing a five-
14 step sequential evaluation process for the ALJ to follow in a
15 disability case.  20 C.F.R. § 416.920.  In the **First Step**, the ALJ
16 must determine whether the claimant is currently engaged in
17 substantial gainful activity.  20 C.F.R. § 416.920(b).  If not, in the
18 **Second Step**, the ALJ must determine whether the claimant has a severe
19 impairment or combination of impairments significantly limiting her
20 from performing basic work activities.  20 C.F.R. § 416.920(c).  If
21 so, in the **Third Step**, the ALJ must determine whether the claimant has
22 an impairment or combination of impairments that meets or equals the
23 requirements of the Listing of Impairments ("Listing"), 20 C.F.R. §
24 404, Subpart P, App. 1.  20 C.F.R. § 416.920(d).  If not, in the
25 **Fourth Step**, the ALJ must determine whether the claimant has
26 sufficient residual functional capacity despite the impairment or
27 various limitations to perform her past work.  20 C.F.R. § 416.920(f).
28 If not, in **Step Five**, the burden shifts to the Commissioner to show

the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.920(g).

Moreover, where there is evidence of a mental impairment that may prevent a claimant from working, the Commissioner has supplemented the five-step sequential evaluation process with additional regulations addressing mental impairments. Maier v. Comm'r of the Soc. Sec. Admin., 154 F.3d 913, 914 (9th Cir. 1998) (per curiam). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 C.F.R. § 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 C.F.R. § 416.920a(c)(2-4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 C.F.R. § 416.920a(d). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 C.F.R. § 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding plaintiff's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§ 416.920a(c)(3)]." 20 C.F.R. § 416.920a(d)(3), (e)(2).

Applying the five-step sequential evaluation process, the ALJ found plaintiff has not engaged in substantial gainful activity since

her application date, July 12, 2005. (Step One). The ALJ then found plaintiff "has the following severe impairments: a personality disorder and a back sprain/strain" (Step Two); however, she does not have an impairment or combination of impairments that meets or equals a Listing.[9] (Step Three). The ALJ next determined plaintiff has no past relevant work. (Step Four). Finally, the ALJ found plaintiff can perform a significant number of jobs in the national economy; therefore, she is not disabled. (Step Five).

**IV**

A claimant's residual functional capacity ("RFC") is what she can still do despite her physical, mental, nonexertional, and other limitations. Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001); Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). Here, the ALJ found plaintiff has the RFC to perform light work[10] other than "work at unprotected heights or around dangerous machinery. She can

---

[9] In reaching this conclusion, the ALJ found plaintiff has "mild" restrictions of the activities of daily living, "moderate" difficulties maintaining social functioning, "mild" difficulties maintaining concentration, persistence, or pace, and has had no episodes of decompensation. A.R. 14-15.

[10] Under Social Security regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b). "[T]he full range of light work requires standing or walking for up to two-thirds of the workday." Gallant v. Heckler, 753 F.2d 1450, 1454 n.1 (9th Cir. 1984); SSR 83-10, 1983 WL 31251, *6.

occasionally climb, balance, stoop, kneel, crouch, crawl, and keyboard. Mentally, she can perform entry level work that requires working with things rather than people." A.R. 15. However, plaintiff contends the ALJ's RFC determination is not supported by substantial evidence because the ALJ improperly rejected the opinions of treating physician Dr. Mueller and treating psychiatrist Dr. Umakanthan. There is no merit to plaintiff's contentions.

The medical opinions of treating physicians are entitled to special weight because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999). Therefore, the ALJ must provide clear and convincing reasons for rejecting the uncontroverted opinion of a treating physician, Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008), and "[e]ven if [a] treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." Reddick, 157 F.3d at 725; Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).

Dr. Mueller opined plaintiff: can frequently lift and/or carry less than 10 pounds; can stand and walk for less than 2 hours in an 8-hour day; can stand for 5 minutes before changing positions, and must walk for 5 minutes every 10 minutes; can sit for less than 2 hours in an 8-hour day, and 15 minutes at a time before changing positions; must be able to switch positions at will; can never twist, stoop,

14

crouch or climb stairs or ladders; must lie down at unpredictable intervals throughout the day; must avoid all exposure to extreme cold and hazards, must avoid even moderate exposure to wetness and humidity, and must avoid concentrated exposure to extreme heat; is limited in her ability to feel with her fingers; and would miss more than three days of work a month due to her condition. A.R. 362-64.

The ALJ, however, rejected Dr. Mueller's opinions because they were "inconsistent with the other significant medical opinions of the consultative examiners and State Agency review physicians. . . ." A.R. 18. Indeed, as the ALJ noted, Dr. Mueller's opinions are inconsistent with the opinions of two examining physicians, Drs. Singh and Enriquez, A.R. 134-38, 167-71, and four nonexamining physicians, Drs. Lizarraras, Naiman, Kaimar, and Taylor-Holmes. A.R. 157-66, 186-93, 218-25, 246. Therefore, the ALJ provided a specific and legitimate reason, supported by substantial evidence in the record, for rejecting Dr. Mueller's opinions.[11] See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) ("The contrary opinions of [the examining and nonexamining physicians] serve as . . . specific and legitimate reasons for rejecting the opinions of [claimant's treating

---

[11] The ALJ also rejected Dr. Mueller's opinions because they were provided in "conclusory form . . . not accompanied or supported by any objective evidence." A.R. 18. However, this is not accurate since there are more than 100 pages of medical records from Dr. Mueller's clinic, Family Practice Associates, including significant "objective evidence" such as a lumbar spine MRI, cervical spine x-rays, lumbar spine x-rays and an EMG study. See, e.g., A.R. 250-52, 259, 332, 363, 382. Therefore, this was not a specific and legitimate reason supported by substantial evidence for rejecting Dr. Mueller's opinions. Lingenfelter, 504 F.3d at 1037 n.8.

1  physician], and provide assurance that the record was sufficiently
2  developed with regard to the issue of physical impairment."); 
3  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (ALJ properly
4  rejected treating physician's opinion, which was inconsistent with
5  other evidence in the record, including examining physician's medical
6  report and nonexamining physician's testimony).

8      Similarly, there is no merit to plaintiff's contention that the
9  ALJ failed to properly consider Dr. Umakanthan's opinions.  Although
10 Dr. Umakanthan treated plaintiff's mental condition, he was unable to
11 offer any opinion regarding plaintiff's ability to function.  See A.R.
12 351 (opining plaintiff's GAF is 0).[12]  To the contrary, Dr. Umakanthan
13 was quite concerned plaintiff might be malingering, A.R. 352, which
14 was consistent with the opinions of every examining psychiatrist and
15 psychologist.  See, e.g., A.R. 130-33 (plaintiff is "poorly
16 motivated), A.R. 197-203 (plaintiff is malingerer), A.R. 226-29
17 (plaintiff is uncooperative and lacking in credibility).  The ALJ
18 reviewed the treatment records from Dept. Mental Health, where Dr.
19 Umakanthan was employed, and the other evidence regarding plaintiff's
20 mental health, and determined that, although plaintiff has a severe
21 mental impairment, she can perform entry level work provided she does
22 not work with people.  A.R. 15-19.  No more is required.  See Howard
23 v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (In assessing
24 claimant's application for disability benefits, ALJ need not set forth

---

[12]  A GAF of 0 means there is "[i]nadequate information" to form an opinion.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

16

verbatim every statement a physician makes; rather, ALJ need only discuss evidence that is significant and probative of a claimant's disability claim).

Here, the opinions of examining physicians and psychologists Drs. Singh, Enriquez, Ahluwalia, Colonna, and Woodard, and nonexamining physicians Drs. Lizarraras, Naiman, Kaimar, Taylor-Holmes, Skopec, Michael, Williams and Gregg constitute substantial evidence to support the ALJ's RFC assessment. Tonapetyan, 242 F.3d at 1149; Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996), cert. denied, 519 U.S. 1113 (1997). Further, the vocational expert's testimony constitutes substantial evidence to support the ALJ's Step Five conclusion that plaintiff can perform a significant number of jobs in the national economy.[13] Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir. 2001); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999).

**ORDER**

IT IS ORDERED that: (1) plaintiff's request for relief is denied; and (2) the Commissioner's decision is affirmed, and Judgment shall be entered in favor of defendant.

DATE:  February 4, 2009          /s/ Rosalyn M. Chapman
                                 ROSALYN M. CHAPMAN
                                 UNITED STATES MAGISTRATE JUDGE

---

[13] The plaintiff also contends the ALJ failed to pose a complete hypothetical question to the vocational expert because the hypothetical question did not include "any mention of Dr. Umakanthan's findings." Jt. Stip. at 13:6-14:1, 14:25-15:1. This argument is without merit since, as discussed herein, Dr. Umakanthan did not offer an opinion regarding plaintiff's limitations.

R&R-MDO\07-1398.mdo
2/4/09

17